## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| HILDA L. SOLIS, Secretary of Labor<br>United States Department of Labor,<br><br>        Petitioner,<br><br>v.<br><br>PULTEGROUP, INC.,<br><br>        Respondent. | Civil Action No. 2:12-mc-50286-AJT-MKM |

### OPPOSITION TO PETITION TO ENFORCE ADMINISTRATIVE SUBPOENA

John F. Birmingham, Jr. (P47150)
Foley & Lardner LLP
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
(313)234-7100
(313)234-2800 [facsimile]
jbirmingham@foley.com

Joseph A. Turzi (admission application to be filed)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202)799-4000
(202)799-5000 [facsimile]
joe.turzi@dlapiper.com

*Counsel for PulteGroup, Inc.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

STATEMENT OF ISSUES PRESENTED .......................................................... iii

STATEMENT OF CONTROLLING AUTHORITIES ....................................... iv

I.      INTRODUCTION ...................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................... 2

        A.      DOL's Instant Subpoena In Context ............................................ 2

                1.      DOL's 2010 Investigation ................................................. 2

                2.      DOL's 2011 Re-Investigation .......................................... 3

                3.      Pulte's Communications With DOL ................................. 4

                4.      DOL's Retaliatory On-Site Inspection ........................... 5

                5.      DOL's Subpoena; Pulte's Compliance and Objections.......... 5

                6.      DOL's Post-Subpoena Legal Misconduct ....................... 6

        B.      Evidence Of Improper Purpose Underlying DOL's Investigation ......... 8

                1.      Union Corporate Campaigns Against Pulte ..................... 8

                2.      DOL's Co-Option Into Union Corporate Campaigns ........... 10

                3.      DOL's Pretextual Justification For Its Investigation.............. 10

III.    ARGUMENT .......................................................................................... 12

IV.     CONCLUSION ....................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chao v. Potter*, 2005 WL 4839145 (W.D. Mich. Aug. 10, 2005) .......................................... 15 n.10

*E.E.O.C. v. Bashas' Inc.*, 2009 WL 3241763 (D. Ariz. Sept. 30, 2009) .................................. 13-15

*Food Lion, Inc. v. UFCW*, 103 F. 3d 1007 (D.D.C. 1997) ....................................................... 8

*Karsten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011) ..... 17

*NAACP v. Patterson*, 357 U.S. 449 (1958) ................................................................................ 16

*NLRB v. Metro. Ins. Co.*, 380 U.S. 438 (1965) ......................................................................... 17

*SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F. 2d. 118 (3rd Cir. 1981) ........................... 13, 15-16

*See v. City of Seattle*, 378 US 541, 547 (1967) ......................................................................... 12

*U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978) ..................................................................... 14

*U.S. v. Markwood*, 48 F. 3d 969 (6th Cir. 1995) ..................................................................... 13

*U.S. v. Powell*, 379 U.S. 48 (1964) ................................................................................. 1-2, 12-13

*U.S. v. Theodore*, 479 F. 2d 749 (4th Cir. 1973) ..................................................................... 16

**STATUTE**

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ......................................................... 1, 15-16

## STATEMENT OF ISSUES PRESENTED

Whether – consistent with the Supreme Court's instruction to deny enforcement to an administrative subpoena where a subpoena is issued for an improper purpose or the investigation underlying the subpoena is not conducted in good faith – this Court should enforce a subpoena issued by Petitioner Department of Labor ("DOL") to Respondent PulteGroup, Inc. ("Pulte"), despite facts that indicate exactly such abuses:

- DOL's subpoena seeks information that cannot have anything to do with a violation of the Fair Labor Standards Act (*e.g.*, the identification of subcontractors and suppliers with whom Respondent may work in the future at yet undeveloped residential construction sites);

- DOL's tactics in this investigation have been less than honorable (*e.g.*, DOL's retaliatory on-site inspection when Pulte questioned the agency's authority and attorneys from DOL's Office of the Solicitor interrogating Pulte's CEO outside of the presence of and without the permission or advance notice to Pulte's counsel at an "executives only" meeting held at DOL's headquarters);

- concurrent with union corporate campaigns against Pulte, DOL inexplicably targeted Pulte for reinvestigation in 2011 when the agency's just-completed multi-month investigation disclosed no FLSA violations whatsoever; and

- significant evidence that this subpoena is due to the influence of unions, including a recent pattern (already noted by Congress) of DOL allowing unions to co-opt the agency's setting of priorities and choices for who to target for investigation (including DOL's use of a report without any validation or peer review and from an author whose biases in favor of union corporate campaigns are open and notorious).

DOL says "yes" and insists that its subpoena must be enforced despite those flaws.  Pulte, consistent with *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F. 2d. 118 (3rd Cir. 1981), says "no"; here, as in that case, "nonfrivolous allegations" of outside influence and abuse dictate that discovery should be allowed and any decision on the enforceability of the subpoena postponed pending exploration of that issue in discovery.  *Id.* at 128 (citing cases).

## STATEMENT OF  CONTROLLING AUTHORITIES

*E.E.O.C. v. Bashas' Inc.*, 2009 WL 3241763 (D. Ariz. Sept. 30, 2009)

*Karsten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011)

*NAACP v. Patterson*, 357 U.S. 449 (1958)

*NLRB v. Metro. Ins. Co.*, 380 U.S. 438 (1965)

*SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F. 2d. 118 (3d Cir. 1981)

*See v. City of Seattle*, 378 US 541, 547 (1967)

*U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978)

*U.S. v. Markwood*, 48 F. 3d 969 (6th Cir. 1995)

*U.S. v. Powell*, 379 U.S. 48 (1964)

*U.S. v. Theodore*, 479 F. 2d 749 (4th Cir. 1973)

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

## I.      INTRODUCTION

Despite the Secretary of Labor's protestations, this is not a routine subpoena enforcement proceeding over mere scope, relevance, or burden.  To the contrary, there is too much  suggesting improprieties in the purpose and execution of  the Department of Labor ("DOL") investigation of and subpoena to PulteGroup, Inc. ("Pulte").

Here, the only items in dispute are Request Nos. 3-5 of DOL's subpoena.  Part of what is wrong here is obvious on the face of those requests.  For example, Request No. 4 of the subpoena does not seek historical data that might be relevant to investigation or redressing supposed violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, but instead seeks future business plans:

> Contracts with all contractors and suppliers of materials **that will perform work within the next 12 month period, . . . .**

January 6, 2012 DOL Subpoena *Duces Tecum* to PulteGroup, Inc (emphasis added).[1]

While such requests for patently irrelevant information alone raise questions about whether DOL's subpoena should be enforced, the requests do not stand alone but are merely one element of the abuse of process that would flow from enforcing this subpoena.  Indeed, DOL admits that "Pulte can defeat an otherwise enforceable subpoena by showing that enforcing the subpoena will abuse this Court's process . . . ."  (DOL Memo at p. 7.)  As the Supreme Court stated when describing the potential for an administrative agency to abuse the judicial process to improperly advance the agency's agenda:

> Such an abuse would take place if the summons had been issued for an improper purpose . . . or for any other purpose reflecting on the good faith of the particular investigation.

---

[1]  A copy of the DOL subpoena is attached as Exhibit I to the Declaration of Michael Laramie (hereinafter "Laramie Declaration"), which itself is attached as Exhibit 1 to this memorandum.

*U.S. v. Powell*, 379 U.S. 48, 58 (1964).  This is just such a case.

There is, moreover, much beyond the overreach of DOL's data requests:

- DOL's tactics in this investigation have been less than honorable (*e.g.*, DOL's retaliatory on-site inspection when Pulte questioned the agency's authority and attorneys from DOL's Office of the Solicitor interrogating Pulte's CEO outside of the presence of and without the permission or advance notice to Pulte's counsel at an "executives only" meeting held at DOL's headquarters);

- DOL inexplicably targeted Pulte for reinvestigation in 2011 when DOL's just-completed 2010 investigation disclosed no FLSA violations whatsoever while simultaneously refusing to proffer a coherent explanation for imposing that burden on Pulte; and

- significant evidence that this subpoena is due to the influence of unions, including a recent pattern (already noted by Congress) of DOL allowing unions to co-opt the agency's choices for who to target for investigation (including DOL's use of a report without any validation or peer review and from an author whose biases in favor of union corporate campaigns are open and notorious).

Simply stated, DOL's instant request for enforcement of the subpoena cannot be sustained on its face.  There is too much amiss:  a lack of good faith (such as baiting Pulte's CEO into an interrogation without counsel); evidence of outside influence "without consciously and objectively" analyzing the suggestions from those non-DOL entities; and a push for data that has no utility in analyzing FLSA compliance but perfectly parallels the pressure tactics of union corporate campaigns.

## II.      FACTUAL BACKGROUND

### A.      DOL's Instant Subpoena In Context

#### 1.      DOL's 2010 Investigation

The investigation forming the basis of the current subpoena follows on the heels of a comprehensive investigation which reviewed virtually every Pulte employee engaged in

construction.[2]  In June 2010, DOL initiated a comprehensive investigation of Pulte Building Systems, LLC ("PBS") involving an enormous expenditure of monies and resources.  *See* Laramie Declaration at ¶ 3.  This investigation ran concurrently with an organizing campaign by the Laborers International Union of North America ("LIUNA") involving the exact same workers as those involved in DOL's investigation.  *See* Laramie Declaration at ¶ 3.  During its investigation, DOL demanded (and PBS provided) timekeeping, payroll and earnings records; DOL. investigators also reviewed personnel files and job descriptions, conducted on-site interviews, and evaluated whether employees were properly classified.  After much time and after imposing significant burdens on PBS, DOL concluded its investigation in August 2011 without any  formal findings of a violation against PBS and did not charge PBS or Pulte with any wrongdoing.  *See* Laramie Declaration at ¶ 3.

## 2.    DOL's 2011 Re-Investigation

On August 1, 2011, DOL's Wage-Hour Division ("WHD") announced via letter its decision to conduct a "comprehensive" investigation of Pulte pursuant to the FLSA.  *See* Laramie Declaration ¶ 4 and Ex. A.

DOL's letter sought *inter alia* **prospective** information that has nothing to do with assessing Pulte's FLSA compliance.  For example, DOL demanded the identification of each single family home community, project, or subdivision where mechanical rough-in or drywall installation had begun or would begin in the next three months; the total number of single family homes constructed within the last year, as well as the number of homes projected to be constructed

---

[2] Pulte has many independent subsidiaries and affiliates.  Because the DOL is treating the parent corporation and these affiliates as one, for ease of reference, Pulte is responding in kind.  However, in doing so, Pulte reserves its argument that such treatment is inappropriate in law and fact.

within the next six months;  and the identification of all contractors and suppliers of material that

will perform work or have performed work.  *See* Ex. A to Laramie Declaration (emphasis added).

### 3.       Pulte's Communications With DOL

In early August, Pulte met with DOL investigators at its headquarters, answered questions,

and sought an explanation for the investigation – an explanation which Pulte did not receive.  *See*

Laramie Declaration at ¶ 5.  Pulte responded in writing on August 30, providing DOL with its list

of subsidiaries and confirming its desire to cooperate but questioning DOL's information requests.

*See* Laramie Declaration ¶ 6 and Ex. B.  For example, Pulte pointed out that DOL had just

completed a comprehensive investigation of more than 95% of its construction employees.  *See* Ex.

B to Laramie Declaration.  Given the unprecedented breadth of DOL's requests and the recent

comprehensive and costly investigation of PBS, Pulte asked for an explanation of the basis for and

purpose of the investigation in order to assess the legitimacy of the request and whether DOL was

exceeding its authority.  *See id*.  In reply, DOL tacitly acknowledged that no issue existed with

respect to Pulte that merited an investigation while repeating like a recorded message that it was

engaged "in a corporate-wide investigation of . . . homebuilders across the country."  *See* Laramie

Declaration ¶ 7 and Ex. C.

Pulte wrote again on October 10 and reminded DOL that it had requested, but that DOL

had failed to provide, a real explanation for making it the target of reinvestigation.  *See* Laramie

Declaration ¶ 8 and Ex.D.  Pulte also reached out to the Solicitor of Labor, initially via telephone

conversation with and then via letter to Richard Kordys (the attorney in DOL's Chicago office

assigned to its investigation of Pulte).  *See* Laramie Declaration ¶ 9 and Ex E.  In its November 22

letter to Kordys, Pulte questioned whether DOL's investigation was an abuse of process.  *See* Ex.

E to Laramie Declaration.

### 4.      DOL's Retaliatory On-Site Inspection

DOL's answer to that November 22 letter was an unannounced, on-site inspection in Redmond, Washington in December 2011.  *See* Laramie Declaration ¶ 10 and Ex. F.  When Pulte protested this in a December 12 letter to DOL (*See* Laramie Declaration ¶ 11  and Ex. G), DOL's Office of the Solicitor replied that the agency may do anything it wishes in investigations (*See* Laramie Declaration ¶ 12  and Ex. H).

While DOL officially stated in its December 22 letter that its Seattle office was unaware of DOL's national level investigation, DOL nonetheless ratified its Seattle office's action by announcing that DOL expected Pulte to provide all of the information requested by that office.  *See* Ex. H to Laramie Declaration.  In fact, the information requested in DOL's December 22 letter is essentially the same as that sought in its subsequent subpoena.

### 5.      DOL's Subpoena; Pulte's Compliance and Objections

DOL issued its subpoena on January 6, 2012.  *See* Laramie Declaration ¶ 13 and Ex. I.  It sought: (1) all payroll records, time sheets, time cards, personnel records and related documents for all persons currently or formerly employed by Pulte or its affiliates who were or are, in any way, involved in the construction of single family homes in eight states for five identified payroll periods; (2) all payroll records, time sheets, time cards, personnel records and related documents for all persons currently or formerly utilized by Pulte at the Redmond Ridge East site in Redmond, Washington; (3) identification of all contractors and suppliers of materials that performed work or provided materials at Redmond Ridge East within the last year, as well as those **who will perform such work or provide materials within the next 12 months**; (4) contracts with entities identified in Request No. 3; and (5) all Form 1099s issued for those who have performed work for Pulte at Redmond Ridge East within the past year.  *See id*. (emphasis added).

In its January 23 letter to DOL, Pulte explained that it would not provide any information responsive to Request Nos. 3, 4, or 5 but would provide specific categories of information responsive to Request Nos. 1 and 2: (1) electronic payroll records for persons employed by Pulte who work at single family construction sites and are involved in the construction of such homes for the states and time periods sought in Request No. 1 and (2) electronic payroll records for current Pulte employees at Redmond Ridge East as specified in Request No. 2. *See* Laramie Declaration ¶ 14 and Ex. J. Pulte also clarified that the company would make a custodian of records available, if DOL so desired, when Pulte provided the above referenced information. *See id*.

Beyond that, Pulte's response re-iterated its concerns that the remaining requests were abusive and being made in bad faith. *See id*. Request Nos. 3, 4, and 5 shed any pretense that the subpoena is aimed at a legitimate DOL purpose. Those requests do not seek information regarding current or former Pulte employees, but instead seek information regarding *other employers*. Worse still, those requests seek such information **for twelve months into the future**, a period during which there clearly could not be any FLSA violations that fall within DOL's authority to investigate.

### 6.     DOL's Post-Subpoena Legal Misconduct

Before Pulte delivered the responsive information, DOL agreed to and held an executives-only meeting at its headquarters in Washington, D.C. on February 15, 2012. *See* Declaration of Richard J. Dugas, Jr. ("Dugas Declaration") at ¶ 4 (attached as Ex. 2). When Richard J. Dugas, Jr. – Chairman, President, and Chief Executive Officer ("CEO") of Pulte – agreed to attend, Pulte inquired and was informed that the only DOL representative at the meeting would be Mary Beth Maxwell, DOL's Senior Advisor in the Office of the Secretary. *Id*. at ¶ 6.

When Mr. Dugas (along with Mr. Miller, the CEO of another construction company under DOL investigation, who was also invited to the meeting) arrived, Ms. Maxwell introduced the two CEOs to three attorneys from DOL's Office of the Solicitor:  M. Patricia Smith, the Solicitor of Labor herself, Irasema Garza, Senior Counselor, and Jennifer Brand, Associate Solicitor for Fair Labor Standards.  *Id*. at ¶ 7.  Ms. Maxwell then left the meeting and these DOL attorneys questioned Mr. Dugas on issues directly relevant to DOL's investigation.  *Id*. at ¶¶ 7-8.

As it is elementary that the rules of ethics prohibit a lawyer from communicating with a represented party, Pulte's counsel wrote to Mr. Kordys on February 22 demanding an explanation for this outrageous behavior.[3]  *See* Laramie Declaration ¶ 15 and Ex. K.  In that letter, Pulte also explained that "there will regrettably be a delay in providing the information in response to DOL's subpoena" in order to sort out this misadventure by DOL's top lawyer: Ms. Patricia Smith (whose name appears on the pleadings in this case).  *See* Ex. K to Laramie Declaration.[4]

DOL's immediate response to Pulte's objection paralleled its response to earlier questions regarding the agency's conduct:  instant retaliation.  Mr. Kordys wrote back on February 27 – 3 business days later – that "the Department has no choice but to proceed with enforcement of the Subpoena Duces Tecum."  *See* Laramie Declaration ¶ 16 and Ex. L.  Meanwhile, that letter reported that "the allegations you raise [violations of legal ethical rules by DOL] will be carefully reviewed and a response will be sent to you soon."  *See* Ex. L to Laramie Declaration.  What was done soon (on the very next day, February 28), however, was only the filing of this action.

---

[3]  Kordys' affidavit, submitted in support of this enforcement action, is conspicuously silent on all of these facts and omits both Pulte's February 22 letter as well as his own February 27 reply letter.

[4]  Pulte subsequently produced the specific categories of documents responsive to Request Nos. 1 and 2 in the subpoena that it had previously agreed to produce to DOL.  *See* Laramie Declaration ¶ 19 and Ex. N.

Pulte subsequently received a response from DOL's Counsel for Ethics, Office of Legal Counsel. *See* Laramie Declaration ¶ 18 and Ex. M. There, DOL insisted that the meeting was merely a "listening session.". *See id*. Yet, this self-serving exoneration was admittedly made without interviewing the non-DOL participants and without explaining any basis for either the Solicitor of Labor or these CEOs having a meeting unrelated to DOL's investigation of these companies. *See* Dugas Declaration ¶ 9.

### B.   Evidence Of Improper Purpose Underlying DOL's Investigation

#### 1.   Union Corporate Campaigns Against Pulte

Since 2006, various labor unions have been openly waging "corporate campaigns" targeting the nation's largest builders of single-family homes. *See* Declaration of Joseph Turzi ("Turzi Declaration"), at ¶ 3 (attached as Ex. 3).[5] *See Food Lion, Inc. v. UFCW*, 103 F. 3d 1007, 1014 n.9 (D.D.C. 1997)(defining union corporate campaigns as encompassing a range of tactics including "requests that regulatory agencies investigate and pursue" the employer who is the target of such a union campaign). (emphasis added).

Such union campaigns, of course, have a motive: applying pressure on the targeted employer in an effort to coerce that employer to acquiesce to union demands. *See* Turzi Declaration, at ¶ 5. The objectives of the AFL-CIO's Building Justice campaign, as asserted by union officials themselves, are straightforward: coercing Pulte to require its subcontractors to use

---

[5]  Initially, there were two parallel campaigns: the "Alliance for Homebuyer Justice" campaign organized and carried out by LIUNA and the "Building Justice" campaign organized and carried out by the International Union of Painters and Allied Trades (IUPAT) and the Sheet Metal Workers International Association (SMWIA), with support from the AFL-CIO. *See* Turzi Declaration ¶ 3. The campaigns eventually merged, and the Building Justice became the primary campaign vehicle. *See id*. Pulte was and still remains a prime target of the campaign. *See id*.; *see also*, POORLY BUILT BY PULTE HOMES (Building Justice's website), http://www.poorlybuiltbypulte.info.

exclusively union labor.  *See* Mike Rabourn, *Organized Labor in Residential Construction*, LABOR STUDIES JOURNAL, Jan. 18, 2008, at 10, 19-21 (identifying Pulte specifically as a target of the AFL-CIO campaign) (citations omitted; emphasis added).  (Ex. B to Turzi Declaration.).

There are two repeated tactics for exerting such "top down pressure."

The first is identifying who a target does business with:

> [t]he employer may depend on certain suppliers who in turn expect the employer to maintain a steady flow of orders.  The supplier might put pressure on the employer to settle with the union if a long dispute would cost the supplier money . . . .  In addition, the supplier might feel that the union will now begin investigating the way *it* does business.

SEIU, CONTRACT CAMPAIGN MANUAL 4-22 (emphasis in original) (Ex. C to Turzi Declaration).  Another union corporate campaign manual adds the following supplementary advice on identifying business plans and those with whom a target may do business: "Is company currently applying for a *permit* to expand, build, transport, or do *anything*?"  Dan La Botz, A TROUBLEMAKER'S HANDBOOK: HOW TO FIGHT BACK WHERE YOU WORK—AND WIN! 240, 242 (1991) (emphasis in original) (Ex. D to Turzi Declaration).

The second tactic is to persuade government agencies to bird-dog the target.  "The only way you can force [the company] to do something . . . is to raise the stakes economically and politically . . . .  You have to deal with real economic and political power and pressure; it cannot be symbolic."  A TROUBLEMAKER'S HANDBOOK, at p. 129 (internal quotations omitted; emphasis added).  Another corporate campaign handbook is even more explicit on this point:

> Legal and regulatory pressure can threaten the employer with costly action by government agencies or the courts.

SEIU, CONTRACT CAMPAIGN MANUAL 4-1 (emphasis added).  The manual then offers the following instructions for doing precisely that: "Can you threaten or actually . . . [c]ause the courts

or regulatory agencies to enforce laws or regulations . . . ?"; can you find "[f]riendly public officials"; and can you "[e]ncourage politicians and regulatory agencies to take actions that support our campaign . . . ." *Id*. at 4-7, 4-34, and 4- 71.

### 2.    DOL's Co-Option Into Union Corporate Campaigns

Consistent with those advice manuals, the Building Justice campaign developed a symbiotic relationship with DOL which not only promoted that campaign at its own events (including the OSHA National Action Summit for Latino Workers) but also participated in union-sponsored events. *See* Turzi Declaration ¶ 7. The involvement, moreover, was from DOL's most senior and elite officials. For example, speakers at the OSHA National Action Summit included the Secretary of Labor and the Solicitor of Labor. *See* Turzi Declaration ¶ 8; *National Action Summit for Latino Worker Health and Safety Detailed Agenda*, UNITED STATES DEPARTMENT OF LABOR, available at http://www.osha.gov/latinosummit/summit-agenda.html.

The National Action Summit well illustrates how DOL permitted its good offices and enforcement powers to be co-opted by unions for their own purposes. Three companies were profiled at this conference and – not coincidentally – each was the target of a corporate campaign by one or more unions: (1) Hyatt Hotels, targeted by the hotel workers union, UNITE HERE; (2) Sodexo, targeted by the service employees union, SEIU; and (3) PulteGroup, targeted by the AFL-CIO's Building Justice corporate campaign. *See* Turzi Declaration ¶ 9. This relationship has not gone unnoticed. Representative John Kline (Chairman of the House Committee on Education and the Workforce) rebuked DOL in July 2011 for permitting itself to be so co-opted. *See* Turzi Declaration ¶ 10 and Ex. G.

### 3.    DOL's Pretextual Justification For Its Investigation

The evidence of co-option is not limited to the participation of the *most* senior DOL officials at what plainly are union campaign events. Here, there is an anomalous shift in DOL's

enforcement approach that "represents a significant departure" from DOL's prior enforcement strategy, a sea change that the agency admits is based on a study by Boston University Professor David Weil – *Improving Workplace Conditions Through Strategic Enforcement: A Report to the Wage Hour Division, May 2010* (hereinafter the "Weil Report")  (Ex. I to Turzi Declaration).[6]  *See* U.S. DEPARTMENT OF LABOR STRATEGIC PLAN FISCAL YEARS 2011-2016, pp. 8, 30 n.12, and 32 n.13, available at www.dol.gov/_sec/stratplan/StrategicPlan.pdf (Ex. H to Turzi Declaration).  DOL's admission and basis for the deviation is significant on multiple levels.

First, DOL has demonstrated a profound lack of interest in the validity of the Weil Report. DOL adopted the study without any validation of its results and does not even possess the raw data underlying that report necessary do so.  *See* Turzi Declaration ¶ 15.  DOL also neither solicited nor accepted any views other than the singular view presented by Weil.  *See id*.  The absence of a critical eye by DOL is all the more suspicious given that peer evaluation of the Weil Report makes clear that unbiased officials would not have relied on that report.  *See* Declaration of John Martin, PhD ("Martin Declaration"), ¶¶ 3-5 and Ex. B (attached as Ex. 4).

Second, DOL's uncritical adoption of Weil's recommendation is not mere error.  Weil's connections to organized labor are so open and notorious that it would be impossible for DOL not to know of those connections.  Weil has authored extensive literature supportive of unions and coercive union tactics; most importantly, he publicly applauds coercive corporate campaign tactics, including union use of regulatory agencies to advance such campaigns.  *See* David Weil, *A Strategic Choice Framework for Union Decision Making*, WORKINGUSA: THE JOURNAL OF LABOR AND SOCIETY, 342-43 (2005), *available at* http://www.scatsurvey.com/Weil_Article.pdf.

---

[6]  Pulte is the only homebuilder identified by name in the Weil Report as an appropriate target for the new DOL strategic enforcement initiative for which Weil advocates.  *See* Weil Report at p. 25.

(*See* Turzi Declaration ¶ 13).[7]  In fact, the Weil Report that formed the basis of DOL's new strategic enforcement plan laments the decline of union representation and encourages an active partnership between regulatory agencies and unions.  *See*, *e.g.*, Weil Report at p. 10.

## III.   ARGUMENT

Contrary to DOL's contentions, the agency does not have unlimited authority to investigate, but is constrained by the Constitution..  A federal regulatory agency's investigation must be "sufficiently limited in scope, relevant in purpose and specific in directive."  *See v City of Seattle*, 378 U.S. 541, 547 (1967); *United States v Powell*, 379 U.S. 48 (1964).  DOL's inadequate and shifting explanations, in response to Pulte's legitimate inquiries, render the agency unable to meet the requirements of the Fourth Amendment and the most fundamental principles of due process.

This is not a typical subpoena enforcement case.  Here, instead, the issue is rarer but constitutionally critical:  abuse of process.  Indeed, DOL's Memorandum admits that "Pulte can defeat an otherwise enforceable subpoena by showing that enforcing the subpoena will abuse this Court's process . . . ."  (DOL Memo, p. 7.)[8]

As the Supreme Court stated when addressing just such a case:

It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused.  Such **an abuse would take place if the summons had been issued for an improper purpose . . . or for any other**

---

[7]  Furthermore, Weil was part of the working group that produced a union-affiliated lobbying effort entitled *Just Pay:  Improving Wage and Hour Enforcement at the United States Department of Labor* in April 2010 – one month before his May 2010 report to DOL – and that is in substance the same as the Weil Report.  *See* Turzi Declaration ¶ 16 and Exs. L and M.

[8]  DOL, however, devotes only slightly more than a page of its Memorandum in an attempt to rebut the position that Pulte has raised throughout DOL's investigation. (DOL Memo, pp. 14-16.) DOL's far lengthier discussion of its subpoena authority under the FLSA is inapposite here. (DOL Memo, pp. 7-14.)

> **purpose reflecting on the good faith of the particular investigation.**

*U.S. v. Powell*, 379 U.S. 48, 58 (1964)(emphasis added); *see also U.S. v. Markwood*, 48 F. 3d 969, 978 (6th Cir. 1995) ("*Powell* also gave subpoena recipients an additional defense").

District courts, accordingly, must guard against being made into rubber stamps by testing the subpoenaing agency's good faith as part of their Fourth Amendment evaluation of each subpoena. For example, "an agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F. 2d. 118, 125 n.9 (3rd Cir. 1981) (en banc).

In *Wheeling-Pittsburgh*, the SEC initiated an investigation and subpoenaed Wheeling-Pittsburgh as a result of requests from a United States Senator (who was prompted by a competing company's interest in stopping Wheeling-Pittsburgh from successfully obtaining certain government loans). There, as here, the issue was exclusively abuse:

> [T]he precise issue before us is whether the [district] court's determination that the SEC allowed its investigatory process to be abused is sufficient under the teachings of *United States v. Powell* . . . .

*Id*. at 119-20.

Where, as here, there are "nonfrivolous allegations" of such influence or abuse, discovery should be allowed and any decision on the enforceability of the subpoena postponed pending exploration of that issue in discovery. *Id*. at 128 (citing cases); *see also E.E.O.C. v. Bashas' Inc*., 2009 WL 3241763, at *11 (D. Ariz. Sept. 30, 2009) (denying enforcement of subpoena and authorizing discovery due to potential abuse issues concerning EEOC using subpoena either to aid a union in its organizing campaign or to aid a private plaintiff who was precluded from taking

further discovery due to a bankruptcy stay; "actual proof" of abuse is not required but only sufficient factual allegations "'from which [this] court might *infer a possibility* of some wrongful conduct' by the EEOC.") (internal citation omitted; emphasis and bracket in original).

There is no set formula for abuse or bad faith. Indeed, the Supreme Court has instructed the district courts to be vigilant. These "*Powell* elements were not intended as an exclusive statement about the meaning of good faith . . . . Future cases may well reveal the need to prevent other forms of agency abuse . . . ." *U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 n.19, 318 n.20 (1978).

Here, the evidence of abuse by DOL is significant and pervasive:

- Pulte is inexplicably targeted for reinvestigation when DOL's just-completed investigation, which ran concurrently with a union organizing campaign involving the exact same workers, disclosed no FLSA violations whatsoever while Pulte's requests for a coherent explanation for this investigation are either rebuffed or ignored. *See supra* at pp. 2-4.[9]

- DOL's tactics in this investigation have been less than honorable (*e.g.*, the retaliatory raid at Redmond Ridge East and attorneys from DOL's Office of the Solicitor interrogating Pulte's CEO outside of the presence of and without the permission or advance notice to Pulte's counsel at an "executives only" meeting held at DOL's headquarters).

- DOL's public embrace of union corporate campaigns not only against Pulte but against others is so open and notorious that it has prompted written rebuke from the Chairman of the House of Representatives' Committee on Education and the Workforce. *See supra* at p. 10.

- DOL insistence on subpoena enforcement of information requests regarding other employers ("all contractors and suppliers that have performed work at the Redmond Ridge East community") **for twelve months into the future** – a time period for which there are no employees nor hours worked for DOL to investigate. *See supra* at pp. 5-6.

- Significant evidence that this subpoena is due to the influence of unions:

---

[9] DOL's assertion that the basis of the investigation is to determine whether home construction workers were being properly paid is palpably pretextual. As a result of DOL's investigation of PBS, the agency already had investigated virtually every Pulte employee engaged in construction work (with the exception of a small number of union-represented employees in St. Louis, Missouri – a state in which DOL was not interested and did not include in its subpoena).

o   a recent pattern (already noted by Congress) of DOL allowing unions to co-opt the agency's setting of priorities and choices for who to target for investigation;

o   building an enforcement theory in residential home construction based upon the Weil Report without any validation or peer review of the report; and

o   accepting the Weil Report from an author whose biases in favor of union corporate campaigns are open and notorious.

Collectively, this is far more ominous that Senator Weicker's letter to the SEC in *Wheeling-Pittsburgh* or the overlapping investigations in *E.E.O.C. v. Bashas' Inc*., each of which was held to be legally sufficient to warrant discovery to evaluate the good faith (and, thus, constitutional reasonableness) of an administrative subpoena.[10]  Here, there is not only the open support of union corporate campaigns and acquiescence in lending DOL's good offices to those campaigns but also the subpoenaed information itself (*i.e.*, who Pulte plans to do business with next year is totally irrelevant to the FLSA) and the imperious approach adopted by DOL throughout this investigation (ranging from overbroad demands to the Solicitor's meeting with Pulte's CEO).   Indeed, the alignment between printed union campaign strategies and DOL's conduct here simply is too precise to be coincidence.

Completely in line with this corporate campaign tactic, the subpoena seeks to identify who Pulte currently does and will do business with in the next 12 months: *i.e.*, Request Nos. 3 -5 (which are the only items of the subpoena at issue).   While the information relating to future work is irrelevant to FLSA enforcement, it has great relevance to union campaign objectives.   There, the objective is to coerce other entities to cease doing business with the target or to pressure the target

---

[10]   DOL's cited cases are inapposite.  For example, in *Chao v. Potter*, 2005 WL 4839145 (W.D. Mich. Aug. 10, 2005), the DOL subpoenas there (unlike here) were issued on the basis of actual evidence of FLSA violations.  Further, there was no issue of legal ethics because DOL's investigators were not attorneys.  Most importantly, that case lacked any issue of outside influence.

to capitulate.  *See, e.g.,* SEIU, CONTRACT CAMPAIGN MANUAL 4-22 ("The supplier might put pressure on the employer to settle with the union if a long dispute would cost the supplier money . . . .  In addition, the supplier might feel that the union will now begin investigating the way *it* does business.") (emphasis in original).

What better way to coerce others to stop doing business with Pulte than to make it known that DOL will not target all construction contractors within an SMSA or within an SIC code, but rather only those who do business with Pulte?  *Accord NAACP v. Patterson*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation . . . may constitute as effective a restraint on freedom of association"); *U.S. v. Theodore*, 479 F. 2d 749, 754 (4th Cir. 1973) (reversing trial court's enforcement of IRS subpoena to accounting firm as abusive: "Nor are [subpoenas] to be used to obtain from large accounting firms the complete records of all clients so that the IRS might determine if there is an error in the return of some unknown taxpayer."). That too is abusive.[11]

Accordingly, even at this early stage, Pulte has presented far more evidence of abuse than was presented in *Wheeling-Pittsburgh* or *Bashas'*.  DOL's instant request for subpoena enforcement, therefore, cannot be sustained on its face.  There is too much amiss:  a lack of good faith; evidence of outside influence "without consciously and objectively" analyzing the suggestions from those non-DOL entities (*Wheeling-Pittsburgh*, 648 F. 2d. at 125 n.9); and a push for data that has no utility in analyzing FLSA compliance.

_____

[11]  DOL, moreover, blithely confirms this in its Memorandum:  "the Department may require Pulte to produce documents regarding other employers and [their] workers at its website so the Department may determine if others there have violated the FLSA . . . ."  (DOL Memo, p. 11.) DOL cites no authority for this proposition.  Regardless of its validity in the abstract, this assertion merely confirms the obvious:  this particular subpoena lacks any appearance of a good faith

Any *post hoc* rationalizations DOL may offer in its reply brief must be discounted **until tested in formal discovery**. *Compare NLRB v. Metro. Ins. Co.*, 380 U.S. 438, 444 (1965) (restating hornbook rule that administrative action cannot be justified by *post hoc* rationalizations of counsel) *with Karsten v. Saint-Gobain Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325, 1335 (2011) (longstanding agency views articulated publicly "reflect careful consideration, not "*post hoc* rationalizatio[n]") (internal citation omitted).  A reply brief is too little, too late.

## IV.   CONCLUSION

For these reasons, enforcement should be stayed and full discovery allowed.

Respectfully submitted,

_____/s/ John F. Birmingham, Jr.___
John F. Birmingham, Jr. (P47150)
Foley & Lardner LLP
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
(313)234-7100
(313)234-2800 [facsimile]
jbirmingham@foley.com

Joseph A. Turzi (admission application to be filed)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202)799-4000
(202)799-5000 [facsimile]
joe.turzi@dlapiper.com

*Counsel for PulteGroup, Inc.*

---

investigation into construction companies in Redmond, Washington, but is targeted only to those who choose to do business with Pulte – an administrative bill of attainder?

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2012, I electronically filed the foregoing Opposition to Enforce Administrative Subpoena with the Clerk of the Court using the ECF system, which will then send notification of such filing to the parties.  Parties may access this filing through the Court's ECF system.

                                                                  _____/s/ John F. Birmingham, Jr.____
                                                                  John F. Birmingham, Jr. (P47150)
                                                                  Foley & Lardner LLP
                                                                   One Detroit Center
                                                                  500 Woodward Avenue, Suite 2700
                                                                  Detroit, MI 48226-3489
                                                                  (313)234-7100
                                                                  (313)234-2800 [facsimile]
                                                                  jbirmingham@foley.com